## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MAURICE MCKINNON, | : | |
| Petitioner, | : | |
| | : | **Civil Action No. 13-7322 (SRC)** |
| v. | : | |
| | : | **OPINION** |
| MR. LOWERY, | : | |
| Respondent | : | |

**CHESLER**, District Judge

This matter comes before the Court upon the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 filed by Petitioner Maurice McKinnon ("Petitioner"), an inmate confined in South Woods State Prison, in Bridgeton, New Jersey. (Am. Pet., ECF No. 6.) On November 1, 2005, a jury in Essex County Court, New Jersey, found Petitioner guilty of (1) first-degree aggravated manslaughter; (2) three second-degree aggravated assaults; (3) third-degree illegal possession of a handgun; and (4) second-degree possession of a handgun with the intent to use it unlawfully. (Am. Pet., ¶¶1-5); State v. McKinnon, 2008 WL 1820695, at *1 (N.J. Super. Ct. App. Div. Apr. 24, 2008). Petitioner was sentenced to a total aggregate term of thirty-four years imprisonment, 85% of which was to be served without parole eligibility in accordance with the No Early Release Act (NERA). Id., at *1. Specifically, the sentencing judge imposed a twenty year sentence on the aggravated manslaughter count; two separate seven-year terms on two of the aggravated assaults, which were consecutive to each other and to the manslaughter count; a seven year term on the remaining aggravated assault count, to run concurrently with the other terms; and a four year concurrent term on the unlawful possession of a handgun count. Id., at *15; (Resp. to Pet. for Writ of Habeas Corpus ("Resp.") at 19, ECF No. 17.) Petitioner appealed his conviction

and sentence, and the Appellate Division, on April 24, 2008, affirmed. Id. The New Jersey Supreme Court denied certification. 196 N.J. 465 (Sep. 24, 2008).

Petitioner filed a petition for post-conviction relief on December 18, 2008. (Resp., ¶11.) The PCR Court denied the petition on October 13, 2010. (Id.) The Appellate Division affirmed, State v. McKinnon, 2012 WL 6196039 (N.J. Super. Ct. App. Div. Dec. 13, 2012), and the New Jersey Supreme Court denied certification, 214 N.J. 235 (Jul. 19, 2013). Petitioner originally filed his habeas petition in this Court on December 5, 2013. Following this Court's May 2, 2014, opinion and order addressing certain procedural deficiencies, Petitioner filed an amended petition on October 24, 2014. He raised the following grounds for relief:

> GROUND ONE:        Excessive Sentence.
>
> GROUND TWO:        Crime Scene Investigator was under indictment.
>
> GROUND THREE:  State failed to prove beyond a reasonable doubt that the defendant had knowingly and voluntarily waived his Miranda/common law rights.

(Am. Pet., ECF No. 6 at 5-8.)

## I.   BACKGROUND

The factual background in this matter was summarized by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal.[1] McKinnon, 2008 WL 1820695. On April 13, 2004, between 9:00 and 9:30 p.m., Martin Perez, his cousin Carlos Matias, Jose Sanchez, Juan Cruz, and Cheryl Green were standing near a Honda Civic owned by Perez parked on James Street in Newark. A dark-colored Acura Legend, variously described by the witnesses as black, green, or gray, with tinted windows, passed the group slowly, made a right turn, circled the block, and came

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

back up James Street at a high rate of speed, stopping in front of the group. The car windows were lowered, a door opened, and at least one individual, later identified as defendant, began shooting.

Perez, at first, "[d]ove" under the Civic with the others, but when he saw "some black boots" step out of the back seat of the Acura, he "took off and ran." When Sanchez saw the car window open and a gun come out, he too "hid under the car" by its front wheels and "play[ed] dead." He did not see the others and as "the shots g[o]t closer," he "kept moving[,] trying to go under the car but [he] couldn't," and was shot in the right leg. He saw Green and Matias lying next to him in "[b]ad shape." Matias was moaning in pain and he knew Green was dead.

Matias had his back to the Acura talking to Sanchez, when he heard shots and felt "something hit [him] in the face." His "first reaction was to hit the floor" and "pretend[ ] like [he] was laying down." He heard "boom, boom, boom," then the shots stopped. Matias heard Green plead, "Please, no, not me," and then "heard again boom, boom, boom."

Cruz lay flat on his stomach near the car, and Green lay next to him, her face near his feet. Cruz saw blood and nudged Green's leg, asking if she was all right, but there was no reaction. Then Cruz saw a pair of brown Timberland boots and he "broke," running "zig zag[ ]" down James Street and into a parking lot, while two people chased after him shooting. Eventually, Cruz saw "alot (sic) of people running towards the other way," and he followed them back to the scene, where he saw people screaming and Green "on the floor."

Meanwhile, Perez had also run "zig zag ... between cars," towards a parking lot until he "passed out" in shock. When he awoke, his body was "numb," and people were removing his clothes, checking to see if he was shot, but he was not. He returned to his car and saw Green on the ground and Matias "laying there like he was dead."

The Newark police department received a report of the shootings at 9:44 p.m. and responded to the scene. During their subsequent investigation, they discovered a stolen Acura that had been partially destroyed by fire, and it was identified as the car in which the shooter, or shooters, had arrived at the scene. Numerous shell casings were recovered, six from a .380 caliber and one from a 9 mm. handgun. In addition, six vials of cocaine were found at the scene.

Sanchez was treated and released from the hospital after a bullet fragment was removed from his leg by hospital staff. He provided police with a statement that night. Matias, though conscious, was unable to give any statement to the police that night because of his wounds. Green suffered gunshot wounds to her left thigh and to the left side of her head, the latter proving to be fatal. A bullet was recovered from her skull at autopsy and was subsequently matched by the State's ballistic expert as having come from the same gun that fired the bullet recovered from Sanchez.

The police took statements from Cruz and Perez the next day and Perez selected defendant's photo from a photographic array he was shown by the police. On April 20, 2004, defendant was arrested by Newark police detective Rasheen Peppers, who advised defendant of his <u>Miranda</u> rights and told him that he was under arrest. Defendant made no statement at the time. Detective Michael Palermo read defendant his <u>Miranda</u> rights again and placed him in a room by himself. Approximately five minutes later, another homicide detective, Joseph Hadley appeared and wanted to retrieve files from the interview room. Palermo told Hadley that defendant was in the room, and that Hadley might know him from the neighborhood where Hadley's mother lived. Hadley went into the room and spoke to defendant for about "two minutes," after which defendant agreed to provide Palermo with a written statement.

Defendant said his purpose in going to James Street was to "talk to [the Puerto Rican dude] so no one would get hurt about the issue," which defendant described as "words going back

4

and forth and ... him thinking that someone stole something from him," which "was suppose[d] to be money or drugs or something." Defendant claimed the problem arose "[a]bout a week and a half or two weeks before this." Defendant described what happened the night of the shooting:

> We pulled up on James Street to look for the Puerto Rican dude, but I did not see him. I thought he wasn't out there so we went back around to go down Orange Street and go up James Street again to see if I see him again. Then I seen him and we must have caught eye contact because he knew it was me because he started to lift his shirt as if he was reaching for a gun. Then I fired two shots. He was ducking. I don't know what he was ducking behind. But then as he was ducking, I was still shooting. Then he ran and I shot on[c]e more. Then I realized I could not hit him, so I got back inside the car. Then we pulled off and we headed straight to the townhouses on Broadway.

Defendant claimed he was dropped off at his grandmother's house after the shooting. He thought the gun he used was a 9 mm. but he was not sure. Defendant provided detailed physical descriptions of his two accomplices, but claimed he knew one of them only as "Rocky" and that he did not know the name of the driver. Defendant denied that either of them had fired shots on the evening in question.

Defendant identified photos of Sanchez, who he knew as "Bolo," as the person with whom he had the "issue," and Matias, who he knew as "Bolo's brother or cousin." Defendant had known both of them for "roughly six or seven years." He told police that he "didn't even know anyone got shot that night" and only learned of that "a couple nights later." He claimed to feel remorse over the shooting of Green. Defendant declined to have his statement recorded by video or audio tape.

At trial, Perez was the only victim who identified defendant. Perez said he "couldn't really see" who was firing the shots, but he recognized defendant, whom he had known for "[a]bout two years." Perez claimed that defendant was the person in the front passenger seat of the Acura, a fact that was contrary to defendant's statement to the police.

On cross-examination, Perez acknowledged telling the police that he believed he was the target of the shooting because he and defendant had a dispute two years earlier. Perez later clarified that defendant's dispute "wasn't with me, it was with the person I was with." Perez admitted that he had been arrested on September 21, 2004, for stealing a car, and subsequently received a probationary sentence. He acknowledged that in March 2005, he was arrested for selling drugs, but once again received a probationary sentence. Perez denied, however, that the prosecutor made any promises to help him in return for his testimony against defendant.

George Martinez also identified defendant in court as the shooter. Martinez testified that he was smoking crack cocaine in the bathroom of his mother's house on James Street when he heard noise that he believed "was fire crackers or something like that." When he looked out the open bathroom window, he saw "a guy shooting at [Martinez's] nephews and Cheryl Green," who were all "on the floor." After the shooting, Martinez provided a statement to the police and picked defendant's photo from an array, though he later tried to recant his statement out of "fear for [his] life." Martinez testified that he had no doubt that defendant was the man he saw with the gun. At the time of trial, Martinez was serving a prison sentence for drug possession, the latest in a string of arrests and convictions.

At trial, Cruz said that he "saw some dudes" whose faces he did not recognize, and although he gave a general description to the police, he was unable to identify defendant. Cruz also had a conviction for drug possession. Sanchez was unable to describe the assailant, or assailants, at all. Defendant did not testify, nor did he call any witnesses on his behalf.

Defendant was tried on charges of conspiracy to commit murder in the second degree, first-degree purposeful and knowing murder of Cheryl Green, first-degree attempted murder of Matias, Perez, Sanchez, and Cruz, and the weapons charges. The jury acquitted Defendant of conspiracy,

murder, and all four charges of attempted murder, but convicted him of the lesser-included offenses of aggravated manslaughter as to the charged murder of Green and three second-degree aggravated assaults as to the attempted murder charges regarding Matias, Sanchez, and Cruz. The jury acquitted Defendant of all charges relating to Perez.

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. <u>Eley v. Erickson</u>, 712 F.3d 837, 846 (3d Cir. 2013) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)). The phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta" of the U.S. Supreme Court's decisions. <u>Williams</u>, 529 U.S. at 412. An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Eley, 712 F.3d at 846 (quoting <u>Renico v. Lett</u>, 130 S.Ct. 1855, 1862 (2010)).

In addition, any state-law-based challenges are not cognizable in federal habeas review. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also, Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

**B.** **Analysis**

**1.** **Ground One**

In Ground One of the habeas petition, Petitioner challenges his sentence for three reasons. First, Petitioner asserts that the trial court improperly balanced the aggravating and mitigating sentencing factors when imposing his sentence. (Am. Pet., ECF No. 6 at 5.) Second, Petitioner claims that the trial court made findings of fact inconsistent with jury findings as justification to impose an excessive sentence. (Id.) Finally, Petitioner contends that the trial court erred by imposing consecutive sentences. (Id.) Respondent argues that Petitioner failed to raise a constitutional issue with respect to his "within-state-guidelines sentence." (Resp., ECF No. 17 at 26.)

Petitioner raised these issues in his direct appeal. In doing so, Petitioner did not raise any federal or constitutional arguments regarding the trial court's application of aggravating and mitigating factors or its imposition of consecutive sentences. (See Def.'s Br. In Supp. of Appeal of J. of Conviction ("Def.'s App. Br."), ECF No. 17-8 at 91-93; 94-96.) Instead, Petitioner's arguments rested solely on state law. The Appellate Division addressed Petitioner's sentencing claim as follows:

> At sentencing, the judge observed that defendant committed these crimes after he had pled guilty to a previous indictable offense, failed to appear for sentencing, and a bench warrant had issued for his arrest. By the age of twenty-one, defendant had been arrested five times and had thirty-one petitions filed against him as a juvenile.
>
> The judge found that aggravating factor three applied, the risk that defendant would commit another crime, because he had "a voluminous record" for a young man and "ha[d] shown a propensity not to learn from his past mistakes," having violated probation in the past. The judge also found aggravating factor six, the extent and seriousness of defendant's prior record, and aggravating factor nine, the need for deterring defendant and others from violating the law. The judge rejected defendant's argument that mitigating factor twelve applied—willingness to cooperate with law enforcement authorities—simply because defendant gave a statement to the police. The judge concluded that the aggravating factors "overwhelmingly" preponderated. Defendant's argument that the judge failed to properly weigh the aggravating and mitigating factors is without merit.
>
> Likewise, his claim that judge "disregarded the jury verdict" and "unconstitutionally made [his] own findings of fact" because the aggregate sentence exceeds that for more serious crimes, such as murder, is also without any merit. Defendant ignores the fact that the sentence reflects an aggregate term for crimes committed against four separate victims.
>
> Defendant also argues that the court's decision to impose consecutive sentences was erroneous "[s]ince all the crimes arose out of the same reckless conduct." But, the judge concluded that defendant should be sentenced to consecutive terms because his crimes involved multiple victims. In State v. Yarbough, 100 N.J. 627, 643–44, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L. Ed.2d 308 (1986), the Court set forth the factors to be considered when deciding whether to impose consecutive or concurrent sentences. The Yarbough factors essentially focus upon "the nature and number of offenses for which the defendant is being sentenced, whether the offenses occurred at different times or places, and whether they involve numerous or separate victims." State v. Carey, 168 N.J. 413, 423, 775 A.2d 495 (2001) (quoting State v. Baylass, 114 N.J. 169, 180, 553 A.2d 326

(1989)). In this case, the trial court properly recognized that the crimes for which defendant was sentenced involved separate, numerous victims and deserved consecutive terms. The sentences imposed do not shock the judicial conscience, and we find no basis to otherwise disturb them.

McKinnon, 2008 WL 1820695, at *16.

A federal court may review a state sentence only where the challenge is based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency," see Grecco v. O'Lone, 661 F. Supp. 408, 415 (D.N.J. 1987) (citation omitted), which means that an attack on the state court's discretion at sentencing cannot be reviewed in a federal habeas proceeding unless there is a showing of a violation of a separate federal constitutional limitation. See Pringle v. Court of Common Pleas, 744 F.2d 297, 300 (3d Cir. 1984). As stated above, the violation of a right created by state law is not cognizable as a basis for federal habeas relief. See Estelle, 502 U.S. at 67–68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "(quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))); see 28 U.S.C. § 2254(a).

As his first basis for relief, Petitioner alleges that the state trial court failed to properly consider aggravating and mitigating factors in sentencing. In his third claim for relief, Petitioner asserts that the trial court erred by imposing consecutive sentences. Petitioner did not allege that these alleged errors violated any federal or constitutional right and the Appellate Division applied only state law in resolving these claims. Accordingly, based on the supporting facts Petitioner alleges for these grounds, which relate only to alleged violations of state law, Petitioner is not entitled to federal habeas relief on these claims. See Engle, 456 U.S. at 120, n. 19.

Petitioner's remaining argument was that the trial judge unconstitutionally made findings of fact that were inconsistent with the jury's findings in order to impose an excessive sentence. A defendant's constitutional rights are violated where a judge imposes a sentence greater than the

statutory maximum based upon additional findings of fact that were not so found by the jury or admitted by the defendant. <u>Blakely v. Washington</u>, 524 U.S. 296, 304 (2004) ("When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment . . . and the judge exceeds his proper authority") (citation omitted); <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000). Here, however, Petitioner is not entitled to habeas relief on this claim. First, Petitioner did not identify any findings of fact that the trial court made that were allegedly contrary to the jury's findings and influenced Petitioner's sentence. Moreover, as the Appellate Division stated, the fact that Petitioner's total sentence exceeds that of a more serious single offense is of no moment where Petitioner's sentence was an aggregate based on serious crimes committed against four different individuals. In addition, as Respondent observes, the trial court imposed terms of incarceration that were within the statutory range for each charge. (<u>See</u> Resp., ECF No. 17 at 21-22); N.J. STAT. ANN. 2C:11-4c (person convicted of aggravated manslaughter may be sentenced to term of imprisonment between ten and thirty years); N.J. STAT. ANN. 2C:43-6a(2) (person convicted of a crime of the second degree may be sentenced to a term between five and ten years); N.J. STAT. ANN. 2C:43-7.2 (requiring 85% period of parole ineligibility for, <u>inter alia</u>, aggravated manslaughter and aggravated assault). Petitioner therefore failed to show that his sentence was "excessive" or otherwise unconstitutional. Accordingly, the Appellate Division's conclusion regarding this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Ground One therefore will be denied.

### 2. Ground Two

In Ground Two, Petitioner states that the crime scene investigator was under indictment for official misconduct for evidence tampering. (Am. Pet., ECF No. 6 at 7.) Petitioner raised this

issue as an evidentiary argument during his direct appeal. Specifically, he argued that the trial court violated his right to due process by refusing to permit the defense to present other-crime evidence regarding the investigator's indictment. Because a pro se habeas petition must be construed liberally and with a measure of tolerance, see Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721–22 (3d Cir. 1989), the Court construes the Petition as asserting this claim before this Court.

> On appeal, the Appellate Division addressed this claim as follows:
>
> Defendant argues that the trial court erred when it refused to allow him to present evidence that one of the crime scene investigators was under indictment for official misconduct because that evidence was relevant to the jury's evaluation of the reliability of the investigation. We are not so persuaded.
>
> Before trial, defense counsel informed the court that she intended to cross-examine Palermo regarding one of the crime scene investigators, Detective Cosgrove, who was under indictment for official misconduct based upon an allegation that he tampered with evidence. According to defense counsel, Cosgrove had mapped and photographed the scene, collected evidence, and done the distance measurements and she argued that the "other crimes" evidence was relevant to the jury's "evaluation of the quality of his work."
>
> Cosgrove never testified at trial, though there was testimony that he had collected evidence at the scene. Defense counsel argued that the fact that Cosgrove was under indictment for evidence tampering was admissible because he "had responsibility for things that not everyone had control over." The State argued that it was not introducing any evidence that Cosgrove was solely responsible for obtaining and securing, and the judge denied defendant's request.
>
> Defendant renews the argument before us. Assuming arguendo that Cosgrove's indictment was evidence admissible under N.J.R.E. 404(b), he never testified. The witnesses who testified did so based upon their own actions and conduct, not those of Cosgrove. To allow them to be cross-examined about Cosgrove's indictment would have been highly prejudicial to the State, and it would have lacked any true probative value. State v. Franklin, 384 N.J. Super. 306, 312, 894 A.2d 1154 (App. Div. 2006).

McKinnon, 2008 WL 1820695, at *14–15.

> As this Court already explained supra, matters of state substantive law, rules of procedure

and evidence are not reviewable in a federal habeas petition. <u>Estelle</u>, 502 U.S. at 67–68; <u>see also</u> <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) ("we have never questioned the power of the States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability, even if the defendant would prefer to see that evidence admitted"). However, evidentiary rulings may violate due process when the petitioner was denied fundamental fairness at trial. <u>See</u> <u>Kontakis v. Beyer</u>, 19 F.3d 110, 120 (3d Cir. 1994); <u>accord</u> <u>United States v. Agurs</u>, 427 U.S. 97, 108 (1976) (explaining that, for a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial). Hence, the appropriate inquiry is whether the claimed error of law is a fundamental defect which inherently results in a complete miscarriage of justice or is an omission inconsistent with the rudimentary demands of fair procedure. <u>See</u> <u>United States v. De Luca</u>, 889 F.2d 503, 506 (3d Cir.1989), <u>cert. denied</u>, 496 U.S. 939 (1990).

The Appellate Division's denial of this claim was not an unreasonable application of Supreme Court precedent. As that court observed, the investigator did not testify at trial. Petitioner has not advanced any argument or evidence that the investigator committed misconduct in his case and the introduction of evidence of his indictment would have been improper propensity evidence that would have prejudiced the State and offered little probative value. In addition, Petitioner retained the ability to cross-examine the State's testifying witnesses with respect to the investigation of his case. Moreover, evidence in the case such as eye witness testimony and Petitioner's own statement went to the key issue in the case – the identity of the shooter – and were separate and apart from the investigator's collection of physical evidence. The state court's exclusion of the other-crimes evidence therefore did not render Petitioner's trial fundamentally

unfair and therefore did not infringe upon his due process rights. Ground Two will therefore be denied.

### 3. Ground Three

In Ground Three, Petitioner asserts that the State failed to prove beyond a reasonable doubt that Petitioner had knowingly and voluntarily waived his <u>Miranda</u>/common law rights. (Am. Pet., ECF No. 6 at 9.) Petitioner states that the Essex County Prosecutor's office recognized that Det. Palermo had not advised Petitioner that a judge had issued an arrest warrant for Petitioner. (<u>Id.</u>) Respondent asserts that the record shows that Petitioner received <u>Miranda</u> warnings on two occasions and waived them and that even if Petitioner was not told that an arrest warrant had issued, federal law contains no such requirement. (Resp., ECF No. 17 at 31-37.)

Petitioner raised this claim during his direct appeal. The Appellate Division analyzed the claim as follows:

> Defendant argues that the judge erred in admitting into evidence the statement he gave to police, contending that the State failed to prove that he knowingly and voluntarily waived his rights because 1) it cannot prove that defendant was advised prior to giving his statement that a judge had already issued an arrest warrant charging him with Green's murder; and 2) because the State failed to produce as a witness "the officer who influenced the defendant to give a statement." We think the argument mischaracterizes the actual evidence in the case and therefore is unavailing.

> At the <u>Miranda</u> hearing, Peppers testified that he arrested defendant in the early morning hours of April 20, 2004, and read defendant his rights from a card. At 10:15 a.m., Palermo claimed that he met with defendant and again advised him of his rights from "a preamble form." Defendant placed his initials next to the five sequentially numbered rights on the form. Palermo testified:

>> After I Mirandized [defendant] I told him that he was under arrest for [the] murder of Cheryl Green which occurred at Baxter Terrace....
>> At that point I walked out of the office and asked [Detective] Hadley if he wanted to talk. He said he would talk to him. [ ] Hadley walked into the room, came out five minutes later, if that.... He says, "Okay, he wants to talk to you."

Defendant signed the <u>Miranda</u> preamble form and the waiver form. The statement began at 11:50 a.m., and ended at 1:30 p.m. Palermo took an addendum to the statement at 4:20 p.m. during which time, he asked defendant:

> Q. K[h]alif did I advised [sic] you before we began this Statement that you were under arrest for the Murder of Cheryl Green?

> A. Yes.

> Q. After you were advised of your rights per Miranda and before I started interviewing you did I tell you that you were locked up for a warrant issued by a Judge for the murder of Cheryl Green?

> A. Yes.

> Q. After being advised about the warrant were you still willing to talk to me?

> A. Yes.

Since the judge found this testimony to be credible, defendant's reliance on <u>State v. A.G.D.</u>, 178 N.J. 56, 835 A.2d 291 (2003), is entirely misplaced. In that case, the Supreme Court held that the State could not carry its burden of establishing an "informed waiver of rights, regardless of other factors that might support [the] confession's admission" because defendant was not advised that an arrest complaint had already been issued before he agreed to speak to the police. <em>Id.</em> at 68, 835 A.2d 291. Here, Palermo's testimony was unequivocal, and it was corroborated by defendant's own answer in which he acknowledged that Palermo told him he was under arrest for Green's murder before he waived his rights.

At the hearing, defendant also argued that the State failed to meet its burden of proof because "we have absolutely no idea what [ ] Hadley said to [defendant]." He renews this argument before us. However, the judge found "no evidence in the case that [ ] Hadley did anything, that he coerced in any way, induced or used police trickery, physical or psychological pressure or anything that would in fact cause the statement of [defendant] to be less than voluntary." We likewise find no basis to conclude otherwise. Defendant had already received his <u>Miranda</u> rights twice, was with Hadley for a brief period of time, and there was no evidence that his will was overborne during that time so as to make his decision to waive his rights and speak to the police an involuntary one.

<u>McKinnon</u>, 2008 WL 1820695, at *12–13.

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment

incorporates the Fifth Amendment privilege against self-incrimination. See Malloy v. Hogan, 378 U.S. 1, 8 (1964). In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. When police ask questions of a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. See Oregon v. Elstad, 470 U.S. 298, 317 (1985). Thus, a confession taken during a custodial interrogation without the provision of Miranda warnings violates the privilege against self-incrimination. See Thompson v. Keohane, 516 U.S. 99 (1995).

"To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the Miranda Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." Thompson, 516 U.S. at 107; Miranda, 384 U.S. at 479. The Miranda Court outlined the procedures to be followed after the police provide these warnings. If the accused requests counsel, then "interrogation must cease until an attorney is present." Miranda, 384 U.S. at 474. "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." Id. at 479.

Here, Petitioner does not claim that his statement was coerced or resulted from any improper police conduct. Rather, Petitioner argues that the State failed to prove beyond a reasonable doubt that his statement was knowing and voluntary because Det. Palermo did not tell

him that a judge had issued an arrest warrant.[2] In rejecting this claim, the Appellate Division did not unreasonably apply, or reach a result contrary to, clearly established federal law. First, Petitioner has not pointed to any Supreme Court precedent holding that a person in custody must be told that a judge has issued an arrest warrant in order to satisfy Miranda; the requirement on which Petitioner relies is one of state law. See State v. A.G.D., 178 N.J. 56, 66-68, 835 A.2d 291, 297-98 (2003) (observing that the New Jersey common law privilege against self-incrimination affords greater protection than the federal privilege). Habeas relief is only appropriate "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011). As discussed above, this Court will not review the state court's application of state law.

Moreover, the record reflects that Petitioner received the required Miranda warnings on

---

[2] Though Petitioner argues that the State did not prove a knowing and voluntary waiver "beyond a reasonable doubt," there is no such federal requirement. It is true that under New Jersey law, the State must prove waiver beyond a reasonable doubt. State v. Bey, 112 N.J. 123, 140, 548 A.2d 887, 895 (1988) (citing State v. Yough, 49 N.J. 587, 231 A.2d 598 (1967)). The United States Supreme Court, however, has not so held. Though the prosecution's burden to prove waiver is "heavy," Miranda, 384 U.S. at 475, the Supreme Court has rejected a reasonable doubt standard:

> In Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), we considered whether the prosecution was required to prove beyond a reasonable doubt that a confession was voluntary. In holding that a preponderance of the evidence was sufficient, we stated that "the purpose that a voluntariness hearing is designed to serve has nothing whatever to do with improving the reliability of jury verdicts." Id., at 486, 92 S.Ct., at 625. Accord, Jackson v. Denno, 378 U.S. 368, 384–385, 84 S.Ct. 1774, 1785, 12 L.Ed.2d 908 (1964), holding that the "reliability of a confession has nothing to do with its voluntariness." A defendant who has not prevailed at the suppression hearing remains free to present evidence and argue to—and may persuade—the jury that the confession was not reliable and therefore should be disregarded.

United States v. Raddatz, 447 U.S. 667, 678 (1980). Thus, for federal habeas purposes, the State was required to prove Miranda waiver by a preponderance of the evidence.

two occasions – once at the time of his arrest, (see Resp. Ex. 20, Tr. of <u>Miranda</u> Hearing, Oct. 5, 2005, ECF No. 18-6 at p. 56), and again at the police station, where Det. Palermo advised Petitioner of his rights via a preamble form, (see <u>id.</u>, at pp. 20-21). Petitioner initialed the statements of his rights and signed the form. (<u>Id.</u> at pp. 23-25.) The trial court, upon review of the evidence and finding the state's witnesses credible, concluded that the State had proven beyond a reasonable doubt that Petitioner's statement was given knowingly and voluntarily. (<u>Id.</u> at 67-68.) Thus, given the record, the Appellate Division's conclusion that Petitioner's <u>Miranda</u> claim lacked merit was not based on an unreasonable determination of the facts or contrary to Supreme Court precedent. Therefore, Ground Three of the petition will be denied.

## IV. CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue. <u>See</u> Third Circuit Local Appellate Rule 22.2. The Court may issue a certificate of appealability only if the petitioner has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue. Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## V.    CONCLUSION

For the reasons discussed above, in the accompanying Order filed herewith, the Court will deny habeas relief.


STANLEY R. CHESLER
United States District Judge

18